# McKITTRICK *v.* ARKANSAS CENTRAL RAILWAY COMPANY.

APPEAL FROM THE ·CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 248. Argued February 2, 1894. — Decided March 19, 1894.

The act of the State of Arkansas of July 21, 1868, (Laws of 1868, 148,) "to aid in the construction of railroads," and the act of April 10, 1869, (Laws of 1868–9, 147,) " to provide for paying the interest upon the bonds issued · to aid in the construction of railroads," taken together created no lien upon the property of a railroad company for whose benefit the state bonds had been issued, notwithstanding the provisions contained in the act of March 18, 1867, (Laws of 1866–7, 428,) as that act had no force in this respect after the adoption of the state constitution of 1869.

*Tompkins* v. *Fort Smith Railway Company*, 125 U. S. 109, affirmed and followed.

The sale of the Arkansas Central Railway in the foreclosure proceedings under the mortgage to the Union Trust Company, and the deed made in pursuance thereof, passed the property to the purchaser free from any claims of the creditors of the railway company.

The alleged frauds of the president of that railway company are examined and held not to invalidate that sale.

Neither the State of Arkansas, nor the holders of the bonds of the State issued in aid of the construction of that railway, were necessary parties to that foreclosure suit.

THIS appeal brought up the final decree of the Circuit Court of the United States for the Eastern District of Arkansas, sustaining a demurrer to a bill filed by the appellant, and dismissing such bill for want of equity.

The appellant, who was the plaintiff below, was a citizen of Great Britain. He sued on behalf of himself and all holders of bonds issued to the Arkansas Central Railway Company by the State of Arkansas, under the provisions of an act of the general assembly of that State, entitled "An act to aid in the construction of railroads," approved July 21, 1868. The defendants were the Arkansas Central Railway Company, a corporation of Arkansas; the Arkansas Midland Railroad Company, a corporation of the same State; and the Union

Trust Company of New York, a corporation of the State of New York.

The bill was of unusual length, and it is difficult to present the case properly without a full statement of its allegations. According to those allegations — which, upon demurrer, must be taken to be true — the case made by the bill was as follows:

By section 6, article 10, of the constitution of Arkansas, in force in 1868, it was provided that "the credit of the State or counties shall never be loaned for any purpose without the consent of the people expressed through the ballot-box." 1 Charters and Constitutions, 148. For the purpose of loaning the credit of the State, and in order to encourage the building of railroads within its limits, the general assembly of Arkansas passed the above act of July 21, 1868, by the first section of which act it was provided: " For the purpose of securing such lines of railroad in this State as the interest of the people may from time [to time] require, the faith and credit of the State of Arkansas are hereby irrevocably pledged, and the proper authorities of the State will and shall issue to each railroad company or corporation, which shall become entitled thereto, the bonds of this State, in the sum of one thousand dollars [$1000] each, payable in thirty [30] years from the date thereof, with coupons thereto attached for the payment of interest on the same in the city of New York, semi-annually, at seven per cent per annum, in the sum of fifteen thousand dollars [$15,000] in bonds for each mile of railroad which has not received a railroad land grant from the United States, and ten thousand dollars [$10,000] in bonds for each mile of railroad which has received a land grant from the United States, on account of which such bonds shall be due and issuable as provided." Laws of Arkansas, No. 48, 1868, 148.

At an election held November 3, 1868, under the provisions of this act, the people of the State voted upon the proposition submitted by it, and a majority of the votes cast at such election voted in favor of it, and "For Railroads."

By the second section of the act, it was made the duty of the board of railroad commissioners to receive applications from

railroad companies for the loan of the credit of the State, and to designate the companies entitled to such aid. The fourth section provided that any railroad company having existence under the laws of the State and desiring to receive the aid referred to in the act might signify the same by application to the board of railroad commissioners, signed by its president and attested by the seal of the company, setting forth its character, organization, capital stock, a map of the line or lines of road proposed to be built, the progress made thereon, the financial condition and resources of the company, with such other information as the case required, and if the board of commissioners found such corporation to be organized according to law, with resources adequate to the purpose, and that the construction of the proposed line or lines of road would be of public benefit, and the board consented to approve and to grant such application, then and thereafter the company or corporation should be entitled to and have a right to ask for and receive the bonds of the State in the act mentioned.

The president of the Arkansas Central Railway Company (which had not received a land grant from the United States) applied to the railroad commissioners for a loan of the credit and bonds of the State, as provided in the act of 1868; and on the 25th of April, 1870, the board awarded to that corporation such aid for a distance of 150 miles and at the rate of $15,000 per mile. Of that action notice was given to the railway company.

The railway company was authorized by its charter to construct, maintain, and operate a railroad from Helena, in the county of Phillips, through the counties of Phillips, Monroe, Arkansas, Prairie, and Pulaski to Little Rock, all in the State, the line so located, exclusive of side tracks, being one hundred miles in length, and also a branch road from a point on its main line at or near Aberdeen to Pine Bluff, in the county of Jefferson.

On the date last mentioned, upon proof being duly made and filed in the proper office, the governor of Arkansas, on an award of the loan of the State's credit, caused to be issued and delivered to the Arkansas Central Railway Company 150

bonds of $1000 each, numbered from 1 to 150, both inclusive. Subsequently, from time to time, at different dates between April 25, 1871, and July 12, 1873, inclusive, on similar proof, the board of railroad commissioners caused to be issued and delivered to the railway company other bonds, 1350 in number and of $1000 each.

Each of the bonds thus issued and delivered certified, by the Governor and auditor, and attested by the secretary and treasurer, under the seal of the State, that the State of Arkansas was indebted " unto the Arkansas Central Railway Company or bearer in the sum of one thousand dollars, lawful money of the United States of America, redeemable, at the city of New York, thirty years from the date hereof, with interest at the rate of seven per cent per annum, payable semi-annually, at the city of New York, on the first day of April and October in each year, on the presentation of the proper coupons hereto annexed. The faith and credit of the State are hereby solemnly and irrevocably pledged for the payment of the interest and the redemption of the principal of this bond, issued in pursuance of an act of the general assembly of the State of Arkansas, approved July 21, 1868, entitled 'An act to aid in the construction of railroads,' the said act having been submitted to and duly ratified by the people of the State at the general election held on November 3, 1868."

Each of the bonds at the time of their issue had sixty interest coupons attached thereto, separately numbered, calling for the payment " to the bearer of thirty-five dollars, in the city of New York, on the first day of October, 1871, being semi-annual interest due on bond No. —."

The Arkansas Central Railway Company, on delivery of the bonds to it, caused and authorized its president to endorse officially upon each bond a special guaranty in the words following : " For a valuable consideration the Arkansas Central Railway Company hereby guarantee to the holder of the within bond the payment of the principal thereof when due, and of the interest thereon, as the same accrues, by the State of Arkansas; and on default of said State of Arkansas to pay such principal or interest, or either, as the same shall become

due, the Arkansas Central Railway Company agree to pay the same to said holder upon delivery of the within bond, or of the coupon for the interest thereon, upon which a default of payment shall have been made."

Under the seventh section of the act referred to, it became the duty of the legislature from time to time to impose upon the railroad company, to which its bonds were issued, a tax equal to the amount of the annual interest on such bonds at the time outstanding and unpaid, and after the expiration of five years from the completion of the road *to impose* an additional special tax of $2\frac{1}{2}$ per cent per annum upon the whole amount of the state aid granted to the company, such taxation to continue until the amount of bonds issued to any company with the interest thereon should be paid by it, in which case the railroad was entitled to be discharged from all claims or liens on the part of the State.

The railway company had not, when this suit was brought, discharged said lien, nor had it been discharged by any one else for or on its behalf.

It was further provided by the eighth section of the act that in case a company should fail to pay the taxes imposed by the seventh section, when the same became due, and for sixty days thereafter, it should be the duty of the treasurer of the State, by a writ of sequestration, to seize and take possession of its income and revenues until the amount of its defaults was fully paid up and satisfied, with costs of sequestration, after which the treasurer was authorized to release any further revenues to its proper officers.

Before the award of the loan of the credit of the State and at the first meeting of the legislature after the election at which the act of 1868 was voted upon and ratified, and before any bonds were issued under it to said railway company, the general assembly of Arkansas passed an act to provide for the prompt payment of the interest upon the bonds which it might thereafter issue to. railroad companies. That act is entitled "An act to provide for paying the interest on the bonds issued to aid in the construction of railroads," and· was approved April 10, 1869. Laws of Arkansas, No. 73, 1868–1869, 147.

In that act it was provided that the auditor of the State should, on or before the 1st of June in each year, certify to the state treasurer the amount of bonds issued to each company, with the amount of semi-annual interest to accrue thereon, that is to say, the amount of interest the State would have to pay on the 1st of October of that year on the bonds issued to each company, and the amount of tax required from each to pay the same, such tax to be due and payable on the 30th day of June of that year. The auditor was required in like manner, on or before the first day of December in each year, to certify to the treasurer of the State the amount of semi-annual interest the State would have to pay on the bonds on the first day of April in the ensuing year, issued under the act of 1868, and the amount of the tax required from each company to pay the same, such tax to be due and payable December 31 of that year.

It was made the duty of the treasurer, upon receipt of the auditor's certificate, to cause notice to be served upon each railroad company on or before the 20th day of June and December of each year, specifying the amount of tax to be paid, which amount should be the interest on the bonds for that period, and demanding the payment of the same into the treasury upon the 30th day of June and the 31st day of December, respectively, in conformity with the provisions of the acts of July 21, 1868, and April 10, 1869.

If, at the expiration of sixty days after the tax became due and payable, the railroad company should fail to make payment, it became the duty of the treasurer, through the attorney general, to make and file a petition in the Chancery Court of Pulaski County, setting forth the amount due and the fact of default, praying the issue of the writ of sequestration contemplated in the act of 1868, and the appointment of a receiver to take the revenue and income of the company for the purpose specified in that act. The receiver, upon such writ being issued, was required to take possession of the incomes and revenues of the defaulting company, with authority to demand and receive all moneys coming to it from the operation of its road. The officers of the defaulting company were required

to pay over to the receiver all moneys coming into their possession as revenue and income, or from operating the railroad; and they were required to submit all necessary books and papers to the receiver for examination. All moneys received and all moneys coming into the hands of the receiver, after meeting proper operating expenses, were directed by the act to be applied to the payment and discharge of the tax due and unpaid. The receivership was to continue until the amounts in default were paid, with the reasonable costs of sequestration. When such payments had been made, the receiver was to be discharged and to withdraw from the management of the affairs of the company.

After the award to the Arkansas Central Railway Company of the loan of the State's credit, to wit, on the 3d day of July, 1871, that company executed a mortgage or deed of trust to the Union Trust Company of New York, as trustee, to secure the payment of $1,200,000, evidenced by coupon bonds bearing interest at the rate of seven per cent per annum. This mortgage embraced all the property and appurtenances of the railroad company. It was not filed for record or recorded in the county of Pulaski until some time in 1871, nor was it filed for record in the other counties through which that railway was to be constructed, operated, and maintained until after that date. Under that mortgage or deed of trust one thousand bonds of $1000 each, and four hundred of $500 each, were executed and delivered to the trustee. It was provided in the mortgage or trust deed that none of said bonds should be deemed issued under the mortgage or otherwise entitled to the benefit or security thereof, or be in any wise obligatory upon the railway company as an evidence of debt, or otherwise, unless or until there should be endorsed thereon a certificate signed by the Union Trust Company, through its proper officer or its successor in trust, authenticating them as being duly and lawfully issued and secured. Mortgage bonds were signed, certified, and issued by the Union Trust Company to the amount of $720,000.

In April, 1873, the railway company cancelled and caused to be destroyed the remaining bonds unissued, to wit, 480 of

the denomination of $1000 each, and on the same day executed and delivered to the Union Trust Company its second mortgage or deed of trust on the same property and appurtenances to secure the payment of 960 bonds, each for the sum of $500, with interest coupons attached, representing the interest to become due thereon semi-annually at the rate of 7 per cent per annum. It was provided in the latter mortgage that none of the bonds should be deemed issued under it or entitled to the benefit or security thereof, or be in any wise obligatory on the railway company as an evidence of debt or otherwise, unless or until there should be endorsed thereon a certificate signed by the Trust Company through its proper officer, authenticating them as being duly and lawfully issued and secured. The second mortgage bonds issued, signed, and certified amounted to $480,000.

On the 6th of September, 1876, a suit in equity was instituted in the court below under the style of the *Union Trust Company of New York* v. *Arkansas Central Railway Company.* The bill in that case contained, among other things, the following : " Twelfth. Your orator further shows that the State of Arkansas has or pretends to have some claim or lien on said railway and the other property of said Arkansas Central Railway Company so mortgaged to your orator as aforesaid, the particulars and nature of which are unknown to your orator, and therefore your orator cannot more particularly state the same." Its prayer was " that it may be ascertained and adjudged what, if any, estate or interest the State of Arkansas has in the said mortgaged property, and also whether the same is prior and superior to or subsequent and subject to the rights, estates, and interest of your orator under the two said several mortgages herein described."

Neither the State of Arkansas nor any of the holders of the bonds issued by the State to the Arkansas Central Railway Company, nor the holders of the coupons attached thereto, were represented in or were parties to that suit; nor was any decree therein rendered which in any manner determined the priority of said bonds, or whether the lien of the State to and for the use and benefit of the holders of the state aid bonds

was subordinate in point of time or equity to that of the bonds issued under the mortgage as aforesaid. A copy of the decree was attached to the bill in this case. In that suit the railway company, being duly served with process, and neither appearing, answering, nor demurring to the bill of complaint, a decree *pro confesso* was taken and entered January 1, 1877. Subsequently, on March 17, 1877, a final decree was passed against the railway company. It was decreed, among other things, that the whole amount of bonds issued under said mortgage, with the interest thereon, was due; that unless the said defendant paid or caused to be paid to said complainant Trust Company, on or before a day certain named, the sum thereof, being the said principal and interest, with costs of suit, the mortgages should be foreclosed, and the equity of redemption of the railway company thenceforth barred from all equity of redemption under said mortgage, and in default of payment the mortgaged premises mentioned in the bill be sold.

The railway company having failed within the time limited to pay the amount of the decree referred to, the mortgaged property was sold July 26, 1877, by a master commissioner of the court, for the sum of $40,000, to S. H. Horner as trustee. Pending that foreclosure proceeding, a receiver was appointed to take charge of the railway, its property and appurtenances, and he did take such charge. By authority of the court betterments were placed upon the railway and property acquired to the extent of $25,000, or about that sum. At that time the railway was completed, equipped, and in operation for a distance of forty-eight miles, and was worth more than $400,000.

Before the sale, to wit, on the 28th of June, 1877, the Lombard Syndicate, Limited, a corporation of England, by and through which the railway company had sold and negotiated many or all of the state bonds issued to the Arkansas Central Railway Company, and which was then the holder of some of them, filed in court a notice and protest, which was in words as follows:

"We, the undersigned, having by public subscription offered

and allotted the bonds of the State of Arkansas given in aid of the Arkansas Central Railway and issued to this railway under the act of the State of 21st July, 1868, which issue was made on April 1, 1870, therefore prior to the so-called first mortgage, bearing date July 3, 1871, and the above-mentioned bonds being endorsed by the railway as follows: 'Special guarantee endorsed by the railway company on each bond: For a valuable consideration the Arkansas Central Railway Company hereby guarantee to the holder of the within bond the payment of the principal thereof when due and of the interest thereon as the same accrues by the State of Arkansas, and in default of said State of Arkansas to pay such principal or interest, or either, as the same shall become due, the Arkansas Central Railway Company agree to pay the same to said holder upon the delivery of the within bond or of the coupon for the interest thereon upon which a default in payment shall have been made.'

"We, on our own behalf and in behalf of the holders of these bonds, hereby solemnly protest against the sale of this railway, as ordered by the court, except due provisions are made for the priority of the above issue, and hereby give notice to all purchasers or intended purchasers that they will buy the road subject to the above claims. This protest has been executed in triplicate, one of which has been forwarded to the registrar of the court to bring it to the notice of the court, one to the receiver, and the third to Messrs. Tappan and Horner, with a request to read it publicly at the time and place of sale."

This protest and notice came to the hands of the receiver and to said Horner before the foreclosure sale, and was read at and before the sale in the presence and in the hearing of said Horner and his alleged *cestuis que trust*.

By the first section of an act of the general assembly, approved May 29, 1874, it was provided: "That an act entitled 'An act to provide for paying the interest of bonds issued to aid in the construction of railroads, approved April 10, 1869,' be, and the same is hereby, repealed." After the passage of that act the officers, agents, and attorneys of the State neglected

and refused, and, at the commencement of the present suit, still refused, to take any steps towards enforcing the payment of the interest on the bonds issued to the Arkansas Central Railway Company.

The Arkansas Midland Railroad Company was incorporated by an act of the general assembly of Arkansas, approved January 20, 1855, with authority to construct a railroad from Helena to Little Rock. It was empowered by its charter to make a lawful contract for uniting its road with any other road having the same terminus or which might at any intermediate point approach its line. On the 8th of March, 1869, there was filed in the office of the Secretary of State at Little Rock, under the general railroad incorporation law of the State, articles of association incorporating the Little Rock and Helena Railroad Company, the purpose of which was to construct a railroad from the city of Little Rock to Helena. By resolution of the board of directors of the Arkansas Midland Railroad Company, adopted August 31, 1870, that company was consolidated with the Little Rock and Helena Railroad Company under the name of the Arkansas Central Railway Company. This action of the board of directors of the Arkansas Midland Railroad Company, changing the name of its road to that of the Arkansas Central Railway Company, was confirmed at a meeting of the stockholders of the former company. At a meeting of the directors of the Little Rock and Helena Railway Company, held January 20, 1871, a resolution was passed declaring: "That we hereby agree to consolidate with said company under the name and style of the 'Arkansas Central Railway Company,' and do hereby authorize and empower W. H. Rogers, the president of this company, to convey unto said Arkansas Central Railway Company all the rights, privileges, and immunities that we have or may have had or by any means may hereafter become entitled to under or by virtue of said organization, and after said conveyance made this company shall utterly cease to exist."

The conveyance referred to in that resolution was, in fact, made, and the rights, privileges, and immunities of both companies were assumed, possessed, and controlled by the Arkan-

sas Central Railway Company, the president of the Arkansas Midland Railroad Company becoming president of the former company, which, formed and continued as aforesaid, is one of the defendants in this suit.

The bill further alleged that A. H. Johnson was the president of the Arkansas Central Railway Company for a long time, and up to the date of the foreclosure aforesaid; that he "brought about" that foreclosure, and became the receiver of said road in that suit, acting as such for a long time; that he subsequently conspired with one W. W. Bailey and J. J. Horner to secure possession and control of said railroad, of which 48 miles had been completed and were. in operation; that to that end he procured Bailey to be appointed receiver in his place and stead, all the while himself drawing the salary of receiver; that in pursuance of that confederation Bailey appointed Johnson superintendent of the railroad, for which the latter was separately paid, giving him certain contracts, whereby Johnson became the holder and owner of receiver's certificates to a large amount, such certificates becoming a charge upon the road superior to any of the mortgage bonds then being foreclosed; that J. J. Horner was, at that time, one of the attorneys of the Union Trust Company in the foreclosure suit and a party to the proceedings in that suit; that S. H. Horner was the brother of J. J. Horner, and pretended to have purchased the railroad at the foreclosure sale, as trustee for Johnson; that afterwards, Johnson and J. J. Horner, pretending to be stockholders of the Arkansas Midland Railroad Company, and claiming that it was never consolidated in the manner stated, and was an independent corporation, met, and with others, whom they pretended to have qualified by issuing to them a few shares of stock in that company, assumed to elect themselves as directors; that as such pretended directors they again met, and by common consent selected from among themselves the officers of the company as follows: Johnson, president and general manager; John J. Horner, vice-president; and S. H. Horner, secretary.

S. H. Horner, who had purchased as aforesaid and then held the said railroad and appurtenances in his capacity as

trustee, thereupon assigned, conveyed, set over, and delivered the same to the Arkansas Midland Railroad Company, the consideration expressed being $600,000, but, in fact, no part of that consideration was ever paid to or received by him as trustee or otherwise, directly or indirectly. A copy of that conveyance was attached to the bill in this case. J. J. Horner, without any consideration whatever, in pursuance of the scheme aforesaid, and as a reward for his services, had conveyed to him a third interest in the railway property, and to S. H. Horner, under like circumstances and for the same consideration, a sixth interest.

By reason of the refusal of the State, its officers, agents, and attorneys, to take any step towards enforcing the payment of the interest on its bonds issued to the Arkansas Central Railway Company, the Arkansas Midland Railroad Company was daily receiving the income and revenue from the operation of the said railroad and was appropriating and had appropriated that income and revenues to its own use and to the use of Johnson and J. J. Horner, and no portion thereof to the payment of the past due interest on the bonds issued by the State to the said railway company.

The plaintiff McKittrick was the owner and holder for value before maturity of coupons attached to five bonds of $1000 each, issued by the State to the Arkansas Central Railway Company, all of which were then due and payable, with interest from the maturity of each coupon until paid. These coupons aggregated more than $5000.

The Arkansas Central Railway Company was hopelessly insolvent, and by the foreclosure and sale heretofore referred to was left entirely without property of any kind from which income or revenue might or could be derived. The corporation was practically dissolved, its directory abandoned, and its property in the hands of the former president and vice-president, who repudiated the liens that had theretofore existed on it.

The bill alleged that under the acts of July 21, 1868, and April 10, 1869, aforesaid, under which said bonds were issued by the State, it was not contemplated by said acts or the said

railway company or the State of Arkansas that the latter should pay the same or the interest thereon out of its own revenues; that as between said State of Arkansas and said railway company said bonds and coupons were accommodation paper, and, in point of fact and in equity, the obligation of said railway company; that the acts of July 21, 1868, and April 10, 1869, aforesaid, were printed and public acts of the State of Arkansas; that the only consideration received by the issuing of said bonds passed to and was received by the said railway company; that the only value the bonds possessed arose out of the fact that the income and revenue of the railway company were pledged for the ultimate redemption of the principal and interest thereof, and that the remedy by sequestration was provided to enforce the prompt payment of the same; and, further, that by virtue of the special guaranty, hereinbefore referred to, endorsed on the several bonds, the Arkansas Central Railway Company equitably appropriated and assigned its income and revenue, as contemplated by said acts, to the payment of the principal and interest thereof, and there then existed in favor of the plaintiff and other holders of said bonds an equitable lien or charge upon said railroad property and its earnings to the extent necessary to discharge the interest due and unpaid, and that such equitable lien or charge continued to attach as the interest matured from time to time until the same, together with the principal amounts of said bonds, have been fully paid; that said special guaranty operated substantially and in effect to raise a trust that bound the railway property and its earnings, and the defendants, who took the same with notice thereof, were in equity obliged to fulfil said trust.

The plaintiff further alleged that Johnson and J. J. Horner, although well advised as officers and stockholders as to the condition and affairs of the Arkansas Central Railway Company, in order to obtain the issue to the company of said railroad aid bonds, made and caused to be made a statement under oath, conformably to the requirements of the act aforesaid, on the 21st day of April, 1871, to the effect that the available resources of the railway company in subscriptions of capital

·stock, in moneys, lands, and other means, were sufficient to prepare one hundred consecutive miles of railroad for the iron rails, when, in truth and in fact — as said Johnson and Horner then well knew — the railway company did not possess the available resources aforesaid. He charged that said statement was made with the fraudulent intent to impose on and mislead the state authorities and to secure from the State of Arkansas, without legal right or authority, ostensibly for the railway company but really and in fact for themselves and for their own private gain and profit, the issuing of said railroad aid bonds; that by means of such false and fraudulent statement the bonds were awarded to and obtained by the railway company; that in and by said act it was provided that, after the showing aforesaid as to available resources, the governor of the State should be authorized to issue to the president of the railway company the said aid bonds upon the completion and preparation for the iron rails of each succeeding ten miles or more of road until the entire line should be completed; and, further, the president of said railway company was required to file his official receipt for each issue of bonds, accompanied by the affidavit of himself and at least four directors that the bonds or the avails of them should be disposed of solely for the purpose of providing for the ironing, equipping, building, and completing of said road. And the plaintiff alleged that notwithstanding the said defendants, as officers and stockholders as aforesaid, by means of false and fraudulent statements made and caused to be made by them as to the completion of consecutive sections of railroad ready for the iron rails, whereby the state authorities were deceived, procured, without right or authority, the issuance to said railway company of the whole amount of $1,350,000 of aid bonds as aforesaid, and that no part of said railroad was built or completed ready for the iron rails when the said bonds or any instalments thereof were applied for and issued, and although the said railway company, by and through said defendants, solemnly obligated itself to devote the avails and proceeds thereof as above stated and required by said act, the same were fraudulently diverted from such purpose and appropriated to the use and advantage

of said defendants, with the exception of the first forty-eight miles of road then in operation.

The bill further alleged that said railway company, by putting said state bonds on the market with the recitals therein contained, — that they were issued under and in pursuance of an act of the general assembly of the State of Arkansas approved July 21, 1868, entitled "An act to aid in the construction of railroads, the said act having been submitted to and duly ratified by the people of the State at the general election held November 3, 1868," — and by the guarantee endorsed thereon as aforesaid, solemnly declared to all persons receiving said bonds that the remedies therein mentioned and the liens thereby created existed and could be enforced, and the same estopped it, as well as all persons claiming under them or it whose claims were junior in time, from denying the validity of the acts aforesaid or the bonds issued thereunder; "that the said S. H. Horner, A. H. Johnson, J. J. Horner, and the said Arkansas Midland Railroad Company were well advised of the award of the state aid granted to said railway company by the said board of railroad commissioners, as aforesaid, before they or any of them acquired said railroad and appurtenances at said foreclosure sale, and that said J. J. Horner and A. H. Johnson were officers of said railway company, applied for and received said state aid, and they, and each of them, and said Arkansas Midland Railroad Company, were, in law and in equity, estopped from denying the validity of said acts of July 21, 1868, and April 10, 1869, and the bonds so issued by the State as aforesaid.

" Your orator submits that while it may be held that the act of July 21, 1868, is not sufficient to sustain the issue of the bonds therein described, and that while the same may be held to be unconditional, that the credit of the State being in jeopardy, it was competent for and within the powers of the general assembly of the said State to provide against any and all emergencies, and to create means for the payment of the bonds and the interest thereon, which were then issued or to be issued, and by said act of April 10, 1869, the general assembly did in fact provide by law means to enforce payment of

the principal and interest on the bonds issued or to be issued under said act of July 21, 1868; that said act of April 10, 1869, was and is a public act, enacted before the granting of aid to said Arkansas Central Railway Company, and before the execution of the mortgage to the Union Trust Company aforesaid, and constituted a public and statutory notice of the matters and things therein contained, and of the liens, rights, and remedies therein provided for the enforcement of the payment of the interest and principal of said bonds, and that the said railroad and appurtenances, its income and revenue, were pledged for the payment of said state aid bonds, and was also notice to all persons holding bonds secured by said trust deed to said Union Trust Company of a prior right, lien, and equity to that of persons claiming by, under, or through said mortgage or trust deed. Your orator submits that the attempt made by the general assembly of the State of Arkansas to deprive him of the benefit and provisions of the act of April 10, 1869, aforesaid, by the passage of the act of May 29, 1874, is an attempt to impair the obligation of the contracts of his said bonds and deprive him of a valuable remedy for the enforcement thereof, and the same is therefore unconstitutional and void. Your orator shows that said Arkansas Midland Railroad is not worth exceeding two hundred and fifty thousand dollars, and that the Arkansas Midland Railroad Company has no other property, and by reason of the large issue of said state aid bonds as aforesaid, and of its other obligations, it is hopelessly insolvent, and that it has been and still is misappropriating its income and revenues."

The relief sought was the appointment of a receiver to take possession and custody of the property, income, and revenue of the railroad property and appurtenances in the possession of the Arkansas Midland Railroad Company, and which it acquired by or through the said S. H. Horner, purchaser at the foreclosure sale; and that such receiver continue in possession until he shall have received an amount of income and revenue to pay the costs and expenses of sequestration, and income and revenue sufficient to pay the amount of said coupons due and payable on the bonds issued by the State and deliv-

ered to the Arkansas Central Railway Company, and which may hereafter become due pending such receivership. The bill asked that an account be stated of revenues and incomes received by the defendant railroad company since it went into possession of the property of the Arkansas Central Railway Company down to the filing of the bill, and that the amount so found be directed to be paid to the plaintiff and such other persons, holders of state aid bonds as aforesaid, as might become parties to this suit. In default of such payment by a day named, the bill asked that the amount or so much as might be found due to the plaintiff and other parties to the bill be decreed a lien on the railroad appurtenances and property aforesaid, to be satisfied if necessary by a sale thereof. If it be held that the plaintiff have a lien junior to said mortgages and incumbrances, the relief asked was a decree that the plaintiffs and others holding such bonds might be decreed to have an equity of redemption in and to such railroad, its appurtenances and other property, and that such equity be declared, and the amount to be paid accurately ascertained. The bill also asked for such other relief as might seem meet in the premises and as equity and good conscience require.

*Mr. M. M. Cohn,* (with whom was *Mr. J. Erb* on the brief,) for appellant.

I. The questions raised in this case were not considered in *Tompkins* v. *Little Rock & Fort Smith Railway Co.,* 125 U. S. 109, and therefore that case is not decisive of this. The acts of 1868 and 1869 are couched in language sufficiently explicit to indicate that the income and revenues of the companies obtaining the state aid were to stand pledged for the payment of the state bonds. In discussing this point the counsel cited: *White Water Valley Canal Co.* v. *Vallette,* 21 How. 414; *Beall* v. *White,* 94 U. S. 382; *Gregory* v. *Morris,* 96 U. S. 619; *Wilson* v. *Boyce,* 92 U. S. 320; *Amoskeag Bank* v. *Ottawa,* 105 U. S. 667; *Leavenworth County* v. *Barnes,* 94 U. S. 70; *South Ottawa* v. *Perkins,* 94 U. S. 260; *Gut* v. *Minnesota,* 9 Wall. 35; *Hamilton Bank* v. *Dudley,* 2 Pet. 492;

*East Hartford* v. *Hartford Bridge,* 10 How. 511; *Elmwood* v. *Marcy,* 92 U. S. 289 ; *Walnut* v. *Wade,* 103 U. S. 683; *Brown* v. *Barry,* 3 Dall. 365; *Gardner* v. *Collector,* 6 Wall. 499; *Johnson County* v. *January,* 94 U. S. 202 ; *Anderson County* v. *Beal,* 113 U. S. 227; *Railroad Companies* v. *Schutte,* 103 U. S. 118; *Ellis* v. *Martin,* 60 Alabama, 394; *Smith* v. *Fields,* 79 Alabama, 335; *Spangler* v. *Jacoby,* 14 Illinois, 297; *English* v. *Oliver,* 28 Arkansas, 317; *Shepardson* v. *Milwaukee & Beloit Railroad,* 6 Wisconsin, 605; *State* v. *Burton,* 11 Wisconsin, 50 ; *Tims* v. *State,* 26 Alabama, 165; *Sullivan* v. *Adams,* 3 Gray, 476 ; *Devoy* v. *New York City,* 36 N. Y. 449; *Campar* v. *Detroit,* 14 Michigan, 276 ; *Childs* v. *Shower,* 18 Iowa, 261 ; *State* v. *Blend,* 121 Indiana, 514; *Ex parte Davis,* 21 Fed. Rep. 396; *Alexander* v. *State,* 9 Indiana, 337 ; *United States* v. ——, 1 Brock. 195; *United States* v. *Brown,* Gilpin, 155 ; *Shunk* v. *Miller,* 5 Penn. St. 250; *Walker* v. *Chapman,* 22 Alabama, 116; *Howie* v. *State,* 1 Alabama, 113; *Hale* v. *Cushing,* 9 Pick. 395 ; *Harper* v. *Rowe,* 55 California, 132 ; *Myer* v. *Hart,* 40 Michigan, 517 ; *Bulloch* v. *Taylor,* 39 Michigan, 137 ; *Gaar* v. *Louisville Banking Co.,* 11 Bush, 180.

II. There is another feature which distinguishes this case from the *Tompkins case.* Here the primary liability is regarded as in the railroad company. In this respect it resembles the case of *Railroad Companies* v. *Schutte,* 103 U. S. 118.

The right to enforce security, given for the payment of negotiable paper, passes to all holders of the paper, pending maturity, even though the security has not been formally transferred or delivered. *Carpenter* v. *Longan,* 16 Wall. 271; *American File Co.* v. *Garrett,* 110 U. S. 288 ; *Pierce* v. *Faunce,* 47 Maine, 507; *Taylor* v. *Page,* 6 Allen, 86 ; *Green* v. *Hart,* 1 Johns. 580; *Jackson* v. *Blodgett,* 5 Cow. 202; *Bloomer* v. *Henderson,* 8 Michigan, 395 ; *Judge* v. *Vogel,* 38 Michigan, 568; *Croft* v. *Bunster,* 9 Wisconsin, 503.

The recital of an unconstitutional act in the bonds could, of itself, have no effect. *Lippincott* v. *Pana,* 92 Illinois, 24; *School District* v. *Stone,* 106 U. S. 183.

Nor was the State a necessary party to the litigation. The

bill recites a repudiation of the debt by the State and its refusal to proceed further in regard thereto. And the mere fact that the State might choose to assert some interest would not oust the court of jurisdiction. *United States* v. *Peters,* 5 Cranch, 115. The State not being liable, we had a right to proceed against the Railroad Company. *Railroad Companies* v. *Schutte,* 103 U. S. 118; *Railroad Co.* v. *Howard,* 7 Wall. 392.

Inasmuch as the Arkansas Central Railway Company was estopped by its guaranty to question the validity of the bonds, and inasmuch as it agreed, "on default of the State of Arkansas to pay the principal or interest of the bonds, or either, as the same shall become due," . . . "to pay the same to the holder," etc., it cannot say that the bonds and coupons were not valid under the act of 1867, no matter what the recitals of the bonds were — and although they might on their face have referred to an act that never had taken effect. The railway company, by sending out the bonds, with its guaranty, proclaimed that they were duly and properly issued, under a valid law, and that if the State did not pay them, it would do so immediately upon the State's default.

III. The present owners are answerable as trustees. *Drury* v. *Cross,* 7 Wall. 299; *Jackson* v. *Ludeling,* 21 Wall. 616; *McGourkey* v. *Toledo & Ohio Central Railway Co.,* 146 U. S. 536; *Richardson* v. *Green,* 133 U. S. 30; *Railroad Co.* v. *Howard,* 7 Wall. 392.

*Mr. John J. Hornor* for the Arkansas Midland Railroad Company and the Union Trust Company, appellees.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

1. The principal question in this case is whether the acts of July 21, 1868, and April 10, 1869, taken together, created any lien upon the property of a railroad company for whose benefit state bonds were issued. That question was determined in *Tompkins* v. *Fort Smith Railway Co.,* 125 U. S. 109, 126, 127.

After observing that if the statutes in question, read in the light of the circumstances attending their passage, disclosed an intention to charge the road of any company to which bonds were issued with liability for the repayment of any loan to it, a court of equity should enforce that charge, Chief Justice Waite, delivering judgment in that case, said: "But after a careful consideration of the statutes, and construing them liberally in favor of the State, we have been unable to find that any such intention did in fact exist. There was a plain and simple way in which such a lien could be created, and that was by providing in express terms for it. That way had been adopted by the State in a statute passed March 18, 1867, and it was the way usually adopted by other States when granting similar aid to their own companies. The wide departure which Arkansas made in this statute from the accustomed form of proceeding, both at home and elsewhere, is strongly indicative of an intention to waive security any further than was embraced in the reserved power of sequestration. The constitution of the State gave authority to issue bonds in aid of such works of internal improvement if assented to by the people. If the people gave their consent, then the bonds when issued became the debt of the State, and there was power in the general assembly, under the constitution of 1868, to levy taxes for their payment, if necessary. This disposes of the cases and renders it unnecessary to consider any of the other questions discussed at the bar or in the briefs. In our opinion, the new companies took the roads free from incumbrance in favor of the State, and neither the State nor its bondholders are entitled to a sequestration of the income and revenue arising therefrom in their hands."

An attempt is made to distinguish this case from *Tompkins* v. *Fort Smith Railway Company*, upon the ground that the act of March 18, 1867, referred to in that case, and entitled "An act loaning the faith and credit of the State in aid of the construction of railroads," was in force when the bonds here in question were issued, and that the plaintiffs and those in whose behalf he sues could avail themselves of the lien given by that act for securing the payment of bonds issued by the

State in aid of the construction of railroads. The section of the act of 1867 giving the lien referred to is in these words: "Sec. 5. That the receipt of any railroad company for the bonds loaned to it by the State shall immediately operate as a lien upon the road, its rights, franchises, and all its property of every description, real and personal; and this lien shall be a mortgage on all the property, rights, and credits of the road, and shall have priority over any and all other debts, contracts, or liabilities of said road; and said mortgage shall continue until the entire amount loaned to the said road by the State shall have been paid off." Laws of Arkansas, 1866–7, No. 166, pp. 428, 430.

The suggestion that the act of 1867 was in force after the passage of that of 1868 is based upon the 12th section of the latter act, which provides: "At the next general election to be holden under the provisions of section three of article fifteen of the constitution of this State, the proper officers having charge of such election shall, upon a poll, as in other cases, take and receive the ballots of the electors qualified to vote for officers at such election for and against this act, in compliance with section six of article ten of the constitution; such ballot to contain the words 'For Railroads' or 'Against Railroads;' and if it appears that a majority so voting have voted 'For Railroads,' this act shall immediately become operative and have full force, and all laws heretofore passed for loaning the credit of this State in aid of railroads shall cease and be void, but if a majority shall be found to have voted 'Against Railroads,' this act shall be void and of no effect." In *Arkansas* v. *Little Rock, Mississippi & Texas Railway*, 31 Arkansas, 701, 721, it was held that the election in 1868 at which the people of Arkansas voted "For Railroads" was a nullity, having been held before the act of 1868 took effect under the constitution of Arkansas, and, consequently, any bonds based upon that election were void. The state court, in its opinion, also suggested reasons why the act of 1868 might be held void as not having been read the requisite number of times, on different days, as required by the state constitution. But it disclaimed any purpose to rest its decision

upon that ground, and placed it upon the one above stated, observing that " the bonds of the State of Arkansas, issued by the governor of the State, her agent, are void, even in the hands of innocent purchasers, because the authority to contract did not exist at the time the bonds were issued."

Upon basis of this decision of the state court it is contended that the act of 1867 was not repealed — the argument being that the laws in force at the date of the act of 1868 authorizing the credit of the State to be loaned in aid of the construction of railroads, were to " cease and be void" only when the act of 1868 became operative and in full force, which, according to the terms of that act, could not, it is claimed, occur until a majority of the qualified electors voting should, at a *valid* election, have voted " For Railroads."

This argument would be entitled to consideration if the act of 1867 was in force after the adoption of the state constitution of 1868, which provided that " the credit of the State or counties shall never be loaned for any purpose without the consent of the people thereof, expressed through the ballot-box." Art. 10, § 6. The state constitution of 1864, in force when the act of 1867 was passed, contained no such restriction upon legislation. As that act authorized the loaning of the credit of the State in aid of the construction of railroads, without first ascertaining by vote the will of the people upon the subject, no bonds could be issued under it, after the adoption of the constitution of 1868, without popular sanction given at a valid election. The express prohibition in that constitution against loaning the credit of the State for any purpose without the previous assent of the people, expressed at the polls, had the effect to withdraw all authority given in previous statutes to lend the credit of the State without first obtaining the consent of the people. *Aspinwall* v. *Daviess County*, 22 How. 364; *Wadsworth* v. *Supervisors*, 102 U. S. 534. In this view, it is unnecessary to consider whether the act of 1868 was void as not having been passed in conformity with the constitutional provision declaring that " every bill and joint resolution shall be read three times, on different days, in each house, before the final passage thereof, unless two-thirds of the house where the

same is pending shall dispense with the rules." Const. Arkansas, 1868, Art. 5, § 21. Even if that act became a law, and if the election of 1868 was valid, still no lien was given by the act of 1868 upon the road of any company receiving bonds from the State. Such was the express decision in the Tompkins case, and we again so adjudge upon the authority of that case.

What has been said shows that the plaintiff cannot take anything on account of the act of April 10, 1869, which assumed to make provision for the payment of the interest on the bonds issued under the act of 1868, in case a company receiving bonds failed to meet such interest at maturity. That act authorized the treasurer of the State to obtain a writ of sequestration, and also the appointment of a receiver who should take the income and revenues of the defaulting company and all moneys arising from the operation of its road. Upon this point, it is quite sufficient to say that it was adjudged in the Tompkins case that the companies that subsequently took a road under foreclosure proceedings, took it "free from incumbrance in favor of the State, and that neither the State nor its bondholders are entitled to a sequestration of the income and revenues arising therefrom in their hands."

2. Apart from any question of lien upon the road of the defendant, does the bill disclose any ground for the relief asked by the plaintiff? Undoubtedly the Arkansas Central Railway Company, to which the bonds were delivered, became liable under its guaranty, endorsed on each bond, of the payment by the State of the principal and interest as they respectively became due. But that only made each holder of bonds a general creditor of the company, without any lien for their security upon its property or revenues. The existence of this liability did not prevent the company from giving a mortgage upon its property to secure any bonds it might issue. The bill shows that the Arkansas Central Railway Company executed to the Union Trust Company in 1871 a mortgage or deed of trust, covering all of its property, to secure the payment of coupon bonds amounting to $1,200,000, and that that mortgage was foreclosed, and the property sold in 1877 in a suit brought

by the mortgagee against the mortgagor. We find nothing in the bill impeaching the validity of that sale, or that would justify the court in holding that the title to the mortgaged property did not pass to the purchaser, S. H. Horner, trustee, free from any claims upon the part of the company's creditors.

It is true that the bill charges that Johnson was president of the railway company as well when the foreclosure proceedings were instituted as while they were pending, and that he "brought about" the foreclosure. By what means did he bring about such foreclosure? Upon that point the bill is silent. It is not suggested that the railway company was able to meet the interest on the bonds secured by the mortgage to the Union Trust Company, or that it was possible for Johnson, or any one else connected with the railway company, to have prevented a foreclosure and a sale of the mortgaged property. So that the charge that Johnson "brought about" the foreclosure does not necessarily impute to him any fraud of which the general creditors of the railway company could complain, or which would affect the integrity of the purchase at the sale in the foreclosure suit. If, then, the purchase by S. H. Horner, trustee, could not be impeached by the holders of state bonds, the payment of which had been guaranteed by the railway company, it is of no consequence to those holders what the purchaser did with the property, or to whom he sold it. So far as the bill discloses, the purchaser took title free from any claim upon it by any creditor of the railway company.

We attach no consequence to the allegation that S. H. Horner "pretended" to have purchased the road as trustee for Johnson. If the former, in fact, purchased for Johnson, and if that circumstance could have affected the validity of Horner's purchase, as against the creditors of the railway company, the allegation upon this subject should have been more direct and positive. Besides, if the sale of the road was not "brought about" by Johnson in violation of his duty as an officer of the company, his official relations to the company prior to the foreclosure did not prevent him from bidding for the property, or from being interested in its purchase by S. H. Horner trustee. So far as is disclosed by the bill, the sale, under

the decree in the suit brought by the Union Trust Company, was fairly conducted, with full opportunity to all persons to become bidders.

Nor is the fact that Johnson was the holder of receiver's certificates, which became a charge upon the property superior to the mortgage bonds in suit, material in the present inquiry; for it does not appear that, if there had been no such certificates in existence, anything would have been left for the general creditors of the railway company after satisfying the holders of mortgage bonds. There is no suggestion in the bill that any receiver's certificates were issued that ought not to have been issued, or in respect to which the court was not fully informed. The mere fact that Johnson obtained receiver's certificates — even assuming that his ownership of them was inconsistent with the relations he held to the mortgaged property — does not affect the validity or integrity of the foreclosure proceedings and the sale of the property under the decree of the court.

Some stress is placed upon the fact that neither the State nor the holders of its bonds were parties to the suit brought by the Union Trust Company. The State could not have been made a party defendant without its consent. Besides, it had, as we have seen, no lien upon or interest in the property, and was under no liability in respect to the bonds issued under the act of 1868. Clearly, the holders of bonds were not necessary parties. They had no lien upon the property, and, at most, were only creditors of the company in virtue of its guaranty endorsed upon the bonds. The only necessary parties were the mortgagee and mortgagor companies.

In respect to the charge that Johnson and J. J. Horner fraudulently procured the issuing by the State of the bonds in question, we do not perceive how such conduct upon their part can constitute a ground for the relief asked in this case. The wrong charged was a wrong to the State of which it could have complained, if the bonds, so fraudulently procured to be issued, had become valid obligations. But, as we have seen, the bonds were invalid as against the State. The fraud alleged to have been practised in procuring the issuing of

them had no connection, in law, with the mortgage executed by the railway company to the Union Trust Company, under which the property was purchased by S. H. Horner at public sale ordered by the decree of a court that had full jurisdiction of the parties and the subject-matter.

Looking at all the allegations of the bill, we are of opinion that the plaintiffs were not entitled to the relief asked.

*Decree affirmed.*

Mr. Justice White, not having been a member of the court when this case was argued, took no part in its decision.