### SUNNY BROOK ZINC & LEAD CO. v. METZLER et al.

(District Court, Southern District of New York. March 13, 1916.)

1. TRUSTS ☞231(1)—TRUSTEES—DUTIES OF.
    A trustee, or one occupying a fiduciary position with respect to property, has no right to obtain the property for himself, as against the beneficiary, by any device whatsoever.

    [Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 330, 335; Dec. Dig. ☞231(1).]

2. TRUSTS ☞102(1)—CONSTRUCTIVE TRUSTS—CREATION.
    Where the manager of a mining company, on foreclosure of a mortgage on the mining property, acquired it under an option secured from the mortgagee, he holds it subject to a constructive trust in favor of the company.

    [Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. ☞102(1).]

3. TRUSTS ☞372(3)—CONSTRUCTIVE TRUSTS—ACTIONS—EVIDENCE.
    In a proceeding to charge the manager of a mine with a constructive trust, it appearing that he procured the property after foreclosure of a mortgage, evidence *held* insufficient to show that he misrepresented to his principal the amount for which the property could be purchased under an option given by the mortgagee.

    [Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 602, 603; Dec. Dig. ☞372(3).]

4. TRUSTS ☞102(1)—CONSTRUCTIVE TRUSTS—OPTION.
    Where the manager of a mining company who had been told to buy in the property if he desired, it having been foreclosed under mortgage, undertook, at the request of the principal stockholder, again to represent the company, he resumed his old obligations, and could not acquire the property as against his principal.

    [Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. ☞102(1).]

5. MORTGAGES ☞596, 597—FORECLOSURE—REDEMPTION.
    Under Rev. St. Mo. 1909, § 2829, giving a mortgagor the right to redeem property sold under mortgage foreclosure within one year if he gives a bond, the bond must be given promptly, and a delay of 40 days is a waiver of any right.

    [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1742–1752; Dec. Dig. ☞596, 597.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. MORTGAGES ⬅︎591(1)—FORECLOSURE—REDEMPTION.

While a mortgagor is given a statutory right of redemption within a year, Rev. St. Mo. 1909, § 2829, does not destroy the old common-law right of redemption when trustee buys in for himself under a power of sale.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1699; Dec. Dig. ⬅︎591(1).]

7. MORTGAGES ⬅︎596, 597—REDEMPTION—LACHES.

Where the owner of mining property, knowing that the trustee had bought in the property for himself or for the benefit of the mortgagor, delayed for over two years in asserting any right of redemption, such right was waived, the property in the meantime having greatly enhanced in value, for such right of redemption may be lost by delay; this being particularly true in case of mines, which are speculative in value.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1742-1752; Dec. Dig. ⬅︎596, 597.]

8. TRUSTS ⬅︎102(1)—CONSTRUCTIVE TRUSTS—RIGHTS IN RESPECT TO.

Where the manager of a mining company, whose property was sold under mortgage foreclosure, was told to acquire the property for his own benefit if he desired, and the company ceased any efforts to redeem, the manager, having acquired the property from the mortgagee, who bought it in, does not hold it subject to any constructive trust, the company's right of redemption having been waived.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. ⬅︎102(1).]

In Equity. Bill by the Sunny Brook Zinc & Lead Company against Zade A. Metzler and others. Bill dismissed, with costs.

This is a suit in equity to impress a trust upon certain real property in Joplin in the state of Missouri, held by the defendant formerly belonging to the plaintiff. The property, which was a mine with attendant machinery, was conveyed to the plaintiff on June 27, 1912, at which time it was already incumbered with a purchase-money mortgage in the face value of $24,000 in favor of one Luke, the vendor upon a former sale. The plaintiff's vendor was itself a mining company, known as the "Hackett Mining Company" which had operated the mine unsuccessfully and had come to an end of its resources. Its capitalization was $121,000, which was represented in the purchase or reorganization by the plaintiff by a substantially corresponding amount of debenture bonds, issued to the former stockholders of the vendor. In order to clear away the debts of the vendor one Isaac Rosenfield advanced to the plaintiff $25,000 upon the security of a mortgage, which was junior to Luke's mortgage, but prior to the debenture bonds. The plaintiff's own capitalization was $121,000, of which Rosenfield or his agents held 51 per cent. for control; this being a condition of his advance. At the time of the conveyance, therefore, the property stood incumbered by Luke's mortgage, then reduced to $18,-000, Rosenfield's mortgage of $25,000, the debenture bonds of $120,000, and the capital stock of $121,000. In November, 1912, the company issued another mortgage for $5,000, not all of which, however, was paid in. The amount of this incumbrance is not definitely stated.

The defendant Metzler had been a stockholder in the Hackett Mining Company, and with parties affiliated in interest with him held over $100,000 of the debenture bonds, and a substantial part of the minority stock. He was a director of the company, the sole local manager at Joplin, Mo., during the operation of the mine as hereinafter set forth, its treasurer, with power to draw money upon his own name alone, and the only person interested in the property in the state of Missouri.

The original purchase from Luke had been for $36,000, and the Hackett Mining Company had put upon it machinery and fixtures of about $80,000 or $90,000 in value, which had not been substantially impaired by use. However, the property was always run at a loss. Hackett, after whom the vendor

company was named, had run it much into debt, though he was thought to be a capable engineer, because the cost of recovery much exceeded the price that could be obtained for the concentrates. After the purchase by the plaintiff, the ill success continued until in January, 1913, at which time, as it had become apparent that under Metzler's management the mine was a failure, it was leased for a period of some months to the Federal Lead Company, which was thought to have exceptional capacity to exploit the mine successfully. Nevertheless, after some five months' trial, the mine continuing to run behind, the Federal Lead Company announced that it would not continue with the lease, and all operations ceased. Meanwhile an installment of $6,000 upon Luke's mortgage was coming due on July 1, 1913, which it was necessary to meet to avoid foreclosure.

In this posture of affairs, there being substantially no cash in the treasury, Metzler came to New York to try to raise money, and first visited Rosenfield, the president, a man of ample means. Rosenfield told Metzler that he had put all the money into the property that he wished, and that he refused to advance anything, except $100 to cover the expenses of an effort by Metzler to get a better sale for the machinery than at auction under foreclosure. Thereupon Metzler saw all the directors, but Hollander and the two Bernheimers, who merely represented Rosenfield upon the board, and tried to get them to rescue the company from its embarrassment. They were unwilling to help, and Metzler tried to persuade all the New York stockholders within reach to make some advances, but also without result. He had therefore tried out nearly all the stockholders, as well as Rosenfield, the majority owner. Finally, he left New York for Joplin, with the understanding that he would try to sell out the property for what he could in advance of the foreclosure sale, sharing with Rosenfield anything above the mortgage to Luke. Rosenfield denies this agreement, but it is extremely probable that something of the kind took place. In any case, there can be no doubt that Rosenfield deputed Metzler to try to sell the property at private sale, in the hope that it would thus bring more than it would at foreclosure. That he should, in addition, have agreed to share the balance the plaintiff claims to be the insinuation of a corrupt bargain, but there is no reason to think that any one could very seriously have supposed that the property at that time would bring more than the sum of the three mortgages. If, not, it is not apparent that the agreement was in any way in fraud of the plaintiff, though it was undoubtedly of an informal character. This consideration should be borne in mind throughout the negotiations between Metzler and Rosenfield in which they treated the property as disposable between them. On his return to Joplin Metzler in pursuance of his agreement made serious efforts ineffectually to sell the machinery, and, finding that impossible, was obliged to let it go in foreclosure.

The trustee under Luke's mortgage was one Boggess, a banker in Joplin, and the owner of practically all the stock in the Boggess Land Company and upon the foreclosure sale, August 15, 1913, the property was bid in by the company. Before the sale Metzler obtained an option from Boggess of 10 days within which he could redeem from the mortgage and reclaim the property. Acting upon the strength of this option, Metzler entered into a contract with the United Iron Works to purchase all the machinery from the land for $16,000, which he hoped might induce Rosenfield to advance the sum of $18,000 sufficient to redeem the whole mine from the mortgage. It seems fairly clear that at this time Metzler intended to buy in the property for himself and Rosenfield to the exclusion of the plaintiff, but his plan miscarried because Rosenfield declined to accept the notes of the United Iron Works, which were to be given in part payment, and advised Metzler in the most categorical way that he was free to take over the property and make from it for himself anything that he could. In consequence Metzler's option from Boggess expired without any result. Shortly thereafter, and early in September, 1913, Rosenfield seems to have changed his mind and wired Metzler that if he could arrange the matter with the United Iron Works and would share equally with him in paying the balance, he would take it on, great care to be exercised to secure Rosenfield even against the stockholders. Although Metzler hoped that he would be able to get an extension of his option from Boggess, it was in

fact too late, because Boggess for Luke on August 30, 1913, had sold the machinery to the United Iron Works, and the transaction was off.

It is the law of Missouri by statute that if a mortgagee under a mortgage buys in the property, the mortgagor may redeem within the year, if he gives a bond promptly to secure the mortgagee. Also the courts of Missouri recognize that a trustee under a mortgage stands charged with the usual liabilities of a trustee towards the mortgagor as well as the mortgagee, and holds any property purchased by him at such a sale charged with the trust. Rosenfield learned of the first provision from Spencer, Graystone & Spencer, attorneys of Joplin, as early as July 9, 1913. On September 16, 1913, Metzler, by letter, explained to Rosenfield that his lawyers had advised him that Luke had no right to take the property and sell it off, and that not only was he subject to a suit for redemption, but that an action might also lie for damages. Rosenfield at once took up the matter with Spencer, Graystone & Spencer, who wrote him on September 29, 1913, that Metzler had had an agreement with Luke and Boggess by which he should have till August 25, 1913, in which to sell off the machinery to the United Iron Works and redeem the property; that the agreement had lapsed; and that Boggess, having bought it in by his company, had sold the property. Rosenfield answered on October 2, 1913, showing his knowledge of the purchase of the property on foreclosure by the Boggess Land Company, and of the rights arising therefrom, and suggesting that Spencer, Graystone & Spencer take the case on a contingent fee. Spencer, Graystone & Spencer wrote on October 16, 1913, refusing to take the case on that basis.

On October 11, 1913, Metzler had an interview with Luke, in which he says he agreed to pay him $3,060 by a note and to cancel a claim he had against him for $2,000, for which Luke agreed to sell him the land. On October 13, 1913, the Boggess Land Company conveyed to Virginia Metzler, Metzler's mother, who in turn conveyed to him two days later. The plaintiff insists that the claim of $2,000 is spurious, and that the total consideration was the note in question. The matter is considered in the opinion which follows. It does not appear that Rosenfield or the plaintiff learned of the conveyances to Virginia Metzler, and from her to Metzler, for a period of over 18 months, that is, until the end of March, 1915. Meanwhile, the value of the mine had greatly changed, owing to the demand caused by the great war. From October 25, 1912, till February, 1913, when the Federal Lead Company took a lease, the average cost of recovery from the mine had been over 80 cents a ton, and under the Federal Lead Company it had cost over $1. The prices in New York for zinc ores continued through 1913 and until the very end of 1914 at less than 60 cents, so that any operation made loss certain. At the end of the year the price of ore began to rise, and in January, 1915, they had reached 65 cents, in February, 1915, 75 cents, after which there was a reaction. In May and June, 1915, they shot up to nearly $1.40 a ton, and with variations have remained at extraordinarily high prices ever since. Early in 1915, and apparently upon the prospect of this rise, Metzler effected a lease of the property, and has been in receipt of substantial royalties ever since.

After some correspondence not necessary to state, the plaintiff filed this bill on July 21, 1915. Metzler alone of all the defendants has been served.

Hollander & Bernheimer, of New York City, for plaintiff.

Louis B. Eppstein, of New York City, for defendant Metzler.

LEARNED HAND, District Judge (after stating the facts as above). The case has been tried upon the assumption throughout that Rosenfield was at no time acting in fraud of the plaintiff, and that notice to him or to his representatives, Bernheimer & Hollander, was notice to the plaintiff. The suit is not by a minority stockholder, seeking to avoid the consequences of the fraudulent acts of its directors; indeed no stockholders appear to be interested in the case save the Rosenfield majority, and I shall therefore assume that Rosenfield

was throughout acting in behalf of the plaintiff. This is indeed clearly not the fact, because his telegram of September 4, 1913, was, beyond question, part of a negotiation intended to be on his own behalf and to secure the property for Metzler and himself to the exclusion of the company. It would be a different question altogether if the plaintiff should take the position that after the telegram in question, no notice to Rosenfield could be notice to the company. For obvious reasons the plaintiff does not take that position, and, there being no evidence that any one in interest objects to this, I must accept the conduct of the cause as presented by the recognized authorities now in control of the plaintiff.

[1] The plaintiff's theory is that Metzler, being a fiduciary, had no right to get the property for himself by any device whatever. This is too well established to require the citation of authorities; the question is of its application. When Metzler went to Joplin in July, 1913, he had absolute knowledge that no money would be forthcoming to redeem the property from the mortgage. His only duty was to get the best sale he could before foreclosure, or to protect the property at foreclosure, if he failed. He could not sell in advance, and on the day of the foreclosure he had no duty but to protect the equity of redemption so long as it lasted. He is criticized for not bidding at the sale, but his arrangement with Boggess before the sale, by which he got an option till August 23, 1913, afterwards extended till August 25, 1913, was all he could do. He had nothing to bid with, no cash, no contract, until his agreement of August 19, 1913, with United Iron Works, and I can see no purpose in his being present and standing idly by at the auction. He had done all he could in getting the option, though probably he intended to hold the property for himself and Rosenfield alone, a purpose certainly not technically regular, but, in view of the liens upon the property, not inconsistent wth substantial honesty.

[2, 3] However, it is quite apparent that had he got the property under that option, he would have held it charged with a constructive trust in favor of the plaintiff. A question arises as to the actual terms of this option, whether $18,000, as he advised Rosenfield, or $16,000, as the plaintiff maintains. That the amount due upon the mortgage was $18,000, and that Luke always insisted that he must get back the full amount of his debt, admit of no dispute. The reasons for doubting whether the option was for $16,000, rather than $18,000, are that in the letter of Spencer, Graystone & Spencer to Rosenfield of September 29, 1913, they say that Metzler had an agreement with Boggess for a deed upon paying "something over $16,000," and that later it was agreed, while Graystone was present, that the deed should pass upon payment of "something over $16,700." It is impossible to reconcile this statement with Boggess' determination to get back the amount due, unless the phrase "something over" includes $1,300, but I see no difficulty in supposing that it might do so. If not, Metzler must be supposed to be stealing $1,300 from Rosenfield, a purpose which the plaintiff says it corroborated because of his insistence upon Rosenfield's keeping the matter secret from Luke, who would only

deal with Metzler personally, though Luke swears that Metzler always professed to be dealing for his principal. In Metzler's wire to Luke of August 21, 1913, occurs the phrase:

"Now if you really want to help me, so that no one but myself will be benefited, this is the time to show it."

I can see no reason for such language if Metzler's version is not true, and I can see a motive of self-protection on Luke's part, who is a defendant, to represent that he never intended to cut the plaintiff out of the benefit of the transaction, and supposed that the plaintiff's rights had terminated when he sold to Metzler.

This does not, however, alone settle the question of the amount of the option which Boggess gave Metzler, though it takes from it the most sinister feature. I do not think that Metzler's wire to Luke of August 21, 1913, just mentioned, should be taken as indicating that the amount of the option was $16,000 rather than $18,000. He was interested in getting Luke to accept the notes of the United Iron Works in place of cash, and he was talking of that. Luke's answer of September 3, 1913, was addressed to this wire and may have had in mind only the failure to produce the cash. Yet the consideration mentioned in the deed somewhat corroborates Graystone's recollection that the price was $16,700 because Luke had realized $13,600 from his own sale of the machinery which would have made the proper balance $3,000. On the other hand, Metzler's story that the eventual sale to him involved also the settlement of his claim against Luke for $2,000 is undisputed, though Luke was not asked about it.

It must be conceded, therefore, that the price of the option is not free from some doubt, yet on a consideration of the situation as a whole, I accept Metzler's story. There can be no doubt, I think, that until Rosenfield's refusal on the 22d, Metzler was exceedingly anxious to get back the property, which he had given every evidence that he thought valuable, and to serve which he had tried his best. He was also in desperate straits to finance the United Iron Works notes, and eventually failed because he could not. It seems to me most improbable that he would have loaded the terms in his wire to Rosenfield with an extra $1,300, which he meant to steal from Rosenfield when he was in such an extremity. Had it not been for Graystone's letter, the matter would have been clear enough, and as I have said, the language of that letter admits of the existence of an option of $18,000.

Metzler is again criticized for failing to tell Rosenfield of his option in season, but the contract with the United Iron Works was dated August 19, 1913, and already on the 18th Metzler was trying to get into touch with Rosenfield. His wire of the 20th told the whole truth to his principal as he knew it, and Rosenfield's answer of the 22d relieved him absolutely of any further liability; it gave him a free hand to get the property for himself. Nothing in the law prevents a fiduciary in such a case to buy for himself; it would be absurd if it did.

[4] The option expired on the 25th, and Metzler thereafter rightly tried to interest Higginbotham, but unsuccessfully. Then on September 2, 1913, Rosenfield changed his mind and took up the negotiations

once more. I agree with the plaintiff that Metzler consented to act again as a fiduciary, and that in so doing he assumed the old obligations and became subject to the same disabilities. His last letter of September 16, 1913, shows that he deemed himself to be still acting for the company.

[5-7] His duty, being to try to redeem the property from the mortgage, was necessarily limited by the rights which the plaintiff still had in it. Under the law of Missouri, when a mortgagee buys in under his power of sale, the mortgagor has the right, within a year, to redeem if he gives a bond, R. S. 1909, § 2829. But this bond must be given promptly, and 40 days' delay has been held too much, Moss v. King, 212 Mo. 578, 111 S. W. 589. Rosenfield learned of this right as early as July 9, 1913, from Spencer, Graystone & Spencer, and allowed the right to lapse. However, that right is not exclusive of the old common-law right of redemption when a trustee buys in for himself under a power of sale. Arnett v. Williams, 226 Mo. 109, 125 S. W. 1154. Such a right had long been recognized in Missouri (Thornton v. Irwin, 43 Mo. 153), and applied equally whether the mortgagee was donee of the power, or some third person. It is not necessary to consider whether the statute is exclusive if the mortgagee is donee because in the case at bar there was a trustee, and it certainly was not.

The plaintiff's rights, therefore, were limited to a redemption in case the trustee under the mortgage bought in for himself, which Boggess did through his company. Nor does it make any difference that the purchase was in fact for Luke, the mortgagee, who had transferred to Boggess by a collusive sale of the notes. These rights arise from Luke's relation to the property, but a quite separate right arises from Metzler's dealings with it. As Metzler had again assumed the character of fiduciary, I think he could not buy in the property until he was discharged of his obligations, and that his purchase of October 13, 1913, must be judged upon that basis. I shall consider each aspect separately.

The plaintiff's rights against Luke were, of course, subject to the usual rule of equity, that inaction might make their subsequent assertion unjust. The statute itself fixes a year even when a bond is given, but the Missouri cases recognize a common-law limitation upon the common-law right (Landrum v. Union Bank, 63 Mo. 48; Kitchen v. St. Louis, etc., Ry. Co., 69 Mo. 224, 264), and the rule is well settled generally (Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Hoyt v. Latham, 143 U. S. 553, 12 Sup. Ct. 568, 36 L. Ed. 259; Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134; Clegg v. Edmondson, 8 De G. M. & G. 787). In considering the application of this rule the first question is the plaintiff's knowledge of the facts. The only relevant facts to its right to redeem were that Boggess, the trustee, had bought in the property by his company, and that he had done so in the interest of Luke; indeed the latter fact is unnecessary. Metzler's letter to Rosenfield of July 16, 1913, asserted that there would be no doubt of showing that the conveyance to Boggess of the notes was an evasive subterfuge, and his

letter of September 16, 1913, left little to conjecture. Rosenfield's two letters of September 25 and October 2, 1913, to Spencer, Graystone & Spencer show that he had a quite correct understanding of the fact that Boggess was acting for Luke, and that the company was in the control of one or both. Spencer, Graystone & Spencer's letter of September 29, 1913, leaves it without question that all three were in a community of interest, and it also informs Rosenfield that the price of the option was "something over $16,700" which, if it had been true, would have been information of the only fact not yet disclosed. It is clear that it was not from any lack of information that Rosenfield failed to proceed, for all the relevant facts were before him, but because he did not rate the value of the property highly enough to be willing to risk any more money in it. What he wanted, and all that held him back, was that he should get some lawyer who would take the case upon a speculative basis. He shows the most certain determination to abandon the claim if he could not get it prosecuted for nothing.

It is quite true that the delay in the case amounts to less than two years, and that in the cases cited it was much longer, but the rule is in no wise rigid or fixed; it depends in each case upon what equity and fair dealing require. In Twin-Lick Oil Co. v. Marbury, supra, pages 592 and 593 of 91 U. S., 23 L. Ed. 328, where the delay was four years, the court says that in cases such as mines, where the value is variable and the variations sudden, the time may be short; the same is held in Clegg v. Edmondson, supra. The case at bar is an extreme instance of the rule. Nothing could be clearer than the determination of the plaintiff to abandon the property as soon as it found it could not get the necessary work done for nothing; the case is not one of mere inaction, but of a proposed suit, abandoned because the property was thought valueless. Mines are notoriously speculative and men should be required to take their position regarding them with some consistency if one is to have the least security in dealing with them. To allow the owner of an equity of redemption after sale to lie back for nearly two years and then to move only when the whole situation has changed is to let him gamble on the mine at the expense of the mortgagee. It is not equity, but injustice.

[8] The remaining question is whether Metzler's purchase of Luke's title changes the situation and gives the plaintiff greater rights against Metzler than it had against Luke. Had Metzler waited until July 1, 1915, the plaintiff's rights being then extinguished, and his own possi·ble duties being long since ended, he could have bought the land free from any obligation. Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592; McKittrick v. Arkansas Central Ry. Co., 152 U. S. 473, 497, 14 Sup. Ct. 661, 38 L. Ed. 518. The question depends, I think, upon whether Metzler had still any duty to the plaintiff which his purchase prevented him loyally from fulfilling. A trustee may not buy in an adverse title, while he still has any duties to discharge, because that prevents his loyal adherence to his beneficiary. On September 20, 1913, Rosenfield wrote Metzler that he was unwilling to spend any money upon a suit, and that if Spencer, Graystone & Spenc-

er would not take the suit upon a contingent fee, which in fact they would not do, he (Metzler) was to drop it as far as Rosenfield was concerned. What had Metzler to do further? He had told his principal all the facts, had urged a suit, and been told that no money was forthcoming. Was he not justified in assuming that his duties were at an end, and that his hands were free? Must he assume that Rosenfield would, a second time, revoke his purpose and seek to recover the property? He was not dealing with children who are of one mind to-day and another to-morrow. He did what any man would have done, who supposed he was dealing with responsible persons, and concluded that the thing was over, and that he was free. So he bought the property on October 13, 1913, having learned presumably that Spencer, Graystone & Spencer would not take the case for nothing. On October 20, 1913, came the next letter, suggesting that the case was still open, and that some of the facts were undisclosed. What again was he to do? Certainly, he acted as any one would have acted, that is, as though with such infirmity of will he could not deal in any way whatever, and that if they wished to do anything, they had the facts to begin. I confess I cannot see how any one could have had better warrant for his conduct or come out with cleaner skirts than he.

Now when after nearly two years of inaction Rosenfield again seeks to press the cause, the situation has totally changed. Metzler's blind and unreasonable confidence in the property has, by a surprising windfall, become justified, and the scepticism of all the others concerned has been disappointed. They seek by this belated assertion of their rights to take from him the reward of his not very intelligent, but persistent faith, in the mine. It seems to me the extreme of injustice that they should be allowed to do so.

Bill dismissed, with costs.