HANLEY v. FEDERAL MINING & SMELTING CO.

(District Court, D. Idaho, N. D. July 22, 1916.)

1. TENANCY IN COMMON ⬡═20(1)—MUTUAL RIGHTS OF COTENANTS—ACQUISITION OF TAX TITLE.

The rule which prohibits one tenant in common from acquiring adversely the interest of a cotenant through a tax sale does not apply to a case where the interests of the cotenants were separately taxed, and the interest of one was sold for taxes, and the title thereto acquired by a third person, to prevent another cotenant from afterward purchasing such interest.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 60; Dec. Dig. ⬡═20(1).]

2. TENANCY IN COMMON ⬡═20(2)—ACQUISITION OF TAX TITLE BY ONE TENANT—TIME FOR REDEMPTION BY COTENANT.

A tenant in common, who acquires title to the joint property through a tax sale, holds such title to the interest of a delinquent cotenant subject only to the right of the latter to redeem within a reasonable time, which depends on the circumstances of the case. In general, where mining property is involved, greater diligence is required than in other cases, because of the fluctuating value of the property.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 61; Dec. Dig. ⬡═20(2).]

3. TAXATION ⬡═796(2)—VALIDITY OF TAX TITLE—IRREGULARITY IN PROCEDURE—WAIVER.

An owner of real property, who permits it to be sold for taxes, and the purchaser to take possession and pay taxes thereon for a number of years, is not in a position to attack the validity of the sale because of mere irregularities in procedure, where the law has been substantially followed.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1579; Dec. Dig. ⬡═796(2).]

4. TAXATION ⬡═89—SEPARATE ASSESSMENT OF INTERESTS OF COTENANTS—IDAHO STATUTE.

Under Rev. Codes Idaho, §§ 1752, 1872, the interests of tenants in common in mining property may be separately assessed and separately sold for delinquent taxes.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. ⬡═89.]

5. TAXATION ⬡═327—ASSESSMENT OF MINING PROPERTY—LEGALITY OF METHOD—IDAHO STATUTE.

The method of taxing mining property prescribed by Rev. Codes Idaho, §§ 1863-1872, the distinctive feature of which is that, instead of assessing the ore bodies, the net proceeds of operation for the preceding year is taxed, in addition to the value of the surface and improvements, is not in violation of Const. Idaho, art. 7, §§ 2, 3, 5, 8, which require all taxes to

---

⬡═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
235 F.—49

be levied in proportion to value, and to be uniform upon the same class of subjects.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 550; Dec. Dig. ⟨⟨⟩⟩327.]

In Equity. Suit by Kennedy J. Hanley against the Federal Mining & Smelting Company. Decree for defendant.

John P. Gray, of Cœur D'Alene, Idaho, Cullen Lee & Matthews, of Spokane, Wash., and W. F. McNaughton, of Cœur D'Alene, Idaho, for plaintiff.

Featherstone & Fox, of Wallace, Idaho, and James E. Babb, of Lewiston, Idaho, for defendant.

DIETRICH, District Judge. The litigation relates to the Skookum mining claim, in Shoshone county, Idaho. In a suit between the plaintiff and the defendant's predecessor, terminating in the year 1907, it was adjudged that the plaintiff was the owner of an undivided one-eighth interest, and that the defendant's predecessor was the owner of the other seven-eighths interest, and upon an accounting plaintiff was awarded a large sum. It is alleged that in 1906 the defendant abandoned the extraction of ores, although there was an understanding between it and the plaintiff that it might continue to operate the entire claim and account to him for his share of the net proceeds; that in July, 1906, the plaintiff's one-eighth interest was sold to Shoshone county for the taxes of 1905, and in July, 1907, it was again sold to the county for the taxes of 1906; that thereafter negotiations were entered into between the defendant and the county for the purchase by the former of the latter's tax title, and that in 1911 this sale was consummated. It is further charged that as a matter of fact the defendant company agreed to operate the claim, and to pay the taxes and other expenses, and to account to the plaintiff for the profits upon the one-eighth interest, but in violation of the promise it willfully permitted the property to lie idle, and made default in the payment of the taxes, for the purpose of wrongfully depriving the plaintiff of his title, by permitting a sale to be made for delinquent taxes, and procuring the title from the purchaser at such sale. The prayer, in substance, is that the plaintiff be adjudged to be the owner of the one-eighth interest, and that defendant be required to account for the profits of operation.

I shall not attempt in detail to review the evidence upon the issues of fact. In the main I am unable to sustain the plaintiff's contentions. It is not thought that the evidence is sufficient to warrant a finding of a fraudulent purpose or intent on the part of the defendant. Furthermore, I am unable to find that it ever agreed to pay the taxes upon the plaintiff's interest. It is to be noted that the conversations which the plaintiff testifies he had with the defendant's manager, evidencing, as it is claimed, some sort of an understanding that the defendant would take care of the taxes, did not occur until after the tax sale in 1906, and probably not until after the tax sale in 1907. Whatever might be said as to the reasonableness of the plaintiff's assumption that the taxes thereafter were to be paid out

of the proceeds of the operation of the mine, if the defendant company was expected to discharge taxes which had become delinquent, especially where sales had already taken place, some reference would doubtless have been made thereto in the conversations or correspondence between the parties.  The testimony is not at all satisfactory as to the alleged letter of February 10, 1909, from the plaintiff to the defendant's manager.  It is difficult to see why such a letter should have been written just at that time, but aside from that consideration there are circumstances which convince me that it was prepared at a later date.  The plaintiff testifies that both it and the one of January 30, 1909, were dictated to and written by Miss Wilson, a public stenographer at the Spokane Hotel.  Her direct testimony is corroborative of this claim, but it is inherently improbable that she would have retained any distinct recollection of the writing of such letter. Besides, she testified that she used only one typewriter, and the evidence is conclusive that the two letters were not written upon the same machine.  She further testified that she uniformly used a certain kind of paper for carbon copies, but when confronted with the fact that these two sheets are entirely different in color and texture she hesitated to say that both are carbon copies.  But if it be assumed that the earlier letter as introduced in evidence is the original, and if we thus account for the difference in paper, we have the further fact that apparently the signatures to the two letters were not made at approximately the same time.  It is possible, of course, to explain the discrepancy in this respect; but in the absence of such explanation the inference is natural, if not unavoidable, that the signature to the letter of February 10th is of a later date.  It indicates great feebleness on the part of the writer, and is suggestive of the malady from which the plaintiff was suffering at the time his deposition was taken.  Without going further into details, I am satisfied that the letter of which the exhibit dated February 10, 1909, purports to be a copy, was never received by the defendant.

In the second amended complaint, verified by the plaintiff, he alleges that about the fall of 1909 the defendant entered into negotiations with the county, without first consulting him, to procure from it such title as it had acquired by reason of the tax sales of 1906 and 1907, from which no redemption had been made, and that thereupon he made objection, as a result of which the defendant was at the time unsuccessful in its efforts, but that thereafter, namely, in 1911, it acquired the county's interest.  Inconsistently, I think, it is now his contention that he did not concern himself with the taxes, because he understood it was the duty of the defendant company to pay them, and further because that company, through its officers, had expressly agreed so to do.  Upon having his attention called to the fact that he was aware that, upon the expiration of the period of redemption, the county was advertising for sale the title which it claimed to his one-eighth interest, he admitted that he may have had actual notice of such advertisement and contemplated sale; but, as he says, it was all right (with him) for the defendant to buy it, because it was protecting him in the matter, and he depended on it,

and further that it did not bother him if the company did buy the county's title, because it was doing that for his protection, according to the agreement which he had with Mr. Miller, its manager. And still he protested against the defendant's acquisition of the title. In this connection it may be significant that one Bacon had recovered a judgment against the plaintiff in June, 1909, for over $50,000, and a levy had been made on execution of the judgment against the plaintiff's interest in the claim. This judgment has never been satisfied, and it is to be inferred from the testimony of Mr. Cullen, who was attorney for Bacon, and who is also one of the attorneys for the plaintiff in this case, that the present action is in reality brought in the plaintiff's name for the use and benefit of Bacon. The fact that the plaintiff was in 1909 being pursued by a large creditor may, in a measure at least, account for his apparent apathy in the matter of the tax proceedings. It is not improbable that he thought that if he rescued his interest from the county it would at once be seized and sold by the execution creditor; whereas, if he permitted title to accrue to the county, and if thereupon the defendant purchased it, he might, through a voluntary conveyance from the company, again acquire title, or he might succeed in one of the contentions which he here makes, namely, that the tax is invalid, or that the defendant, being a co-owner, could not, by purchasing the outstanding interest, deprive him thereof.

There is an apparent contention, though not very clearly defined, that, having in its hands funds of the plaintiff arising from the operation of the mine, the defendant used the same to buy in the outstanding tax title, and therefore, under a familiar principle of equity, it necessarily holds such title in trust for the benefit of the plaintiff. There is no attempt to trace any specific fund belonging to the plaintiff into the purchase price of the property. It is claimed only that upon a fair accounting it would appear that the defendant did not from time to time turn over to the plaintiff the entire one-eighth of the net proceeds of operation, and this unaccounted for balance was in excess of the amount paid for the tax title. But, passing the consideration that such fund, if it existed, is not identified with the purchase price, let us analyze the claim that the defendant at any time had in its hands moneys belonging to the plaintiff. In the suit already referred to, involving the question of the plaintiff's ownership of the one-eighth interest, an accounting was ordered and had, as a result of which the defendant made payments to the plaintiff aggregating several hundred thousand dollars, the last payment being made in 1907, at which time the controversy was finally closed and fully settled. From time to time in the course of the hearings in the present suit a question has incidentally arisen as to the fairness of that accounting, and it is to be conceded that certain testimony offered tends to show error; but such a question is wholly beyond the present issue, and at this juncture the accounting had in the former suit and the settlement made pursuant thereto must be regarded as conclusive upon both parties.

It is further shown that the defendant extracted no ores from the Skookum claim from 1906 up to the fall of 1909; the property was idle; it is so alleged in the bill. Manifestly, therefore, the defendant had no funds belonging to the plaintiff with which to pay taxes prior to the fall of 1909. It follows that no good purpose would be accomplished by taking an account to cover the operations intervening between the fall of 1909 and the time in 1911 when the defendant acquired the tax title from the county, for, if the county acquired title at all, it vested prior to the commencement of mining operations in 1909, on account of the tax sale in July, 1906, and hence the proceeds of subsequent operation would be payable to the county and not to the plaintiff. If, on the other hand, the county did not acquire the title, owing to the invalidity of the tax proceedings, an accounting after 1909 would at this time be useless, for upon that assumption the title is still in the plaintiff, whatever may have been the net result of the mining operations. I am aware that this reasoning does not apply to claims of title resting on sales made subsequently to 1906. But, as I understand, these later sales may be ignored, for, if the sale of 1906 was valid, the others are of no moment, and, if it was void, so were all of them. There is some contention of a double assessment, and of unfairness on the part of the defendant's manager in answering inquiries of the assessor touching the output for certain years; but it was clearly the intention of the county officers to assess the plaintiff's interest separately, and it was so assessed. If the assessment was too high, that is a matter we cannot now inquire into or remedy; the fact does not affect the jurisdiction of the assessing officers. The plaintiff never paid any taxes at all, and has never even offered to pay that which in any view was equitably due from him. And while the record touching the assessment upon which the defendant paid its taxes is somewhat ambiguous and uncertain, there is really little room for doubt that the county officers intended such assessment to extend only to the seven-eighths interest, and that the defendant company understood that it was so limited.

[4] It is argued that, if it be assumed that the title passed to the county and then to the defendant, still the defendant must be held to be a trustee for the plaintiff, under the general rule by which one tenant in common is prohibited from purchasing an interest in the property against his cotenant. But if it be held that the defendant acted in good faith and was under no obligation, either of law or contract, to pay the taxes, and further that it did not buy in the title with funds belonging to the plaintiff, the contention is thought to be without merit. The plaintiff's interest was separately assessed, and was sold to the county; the county thus becoming the absolute owner thereof. The rule relied upon does not extend to such a case. Bennett v. North Colorado Springs Land & Improvement Co., 23 Colo. 470, 48 Pac. 812, 58 Am. St. Rep. 281; McCready v. Fredericksen, 41 Utah, 388, 126 Pac. 316; Westergreen v. Beer (Cal. App.) 145 Pac. 543; Starkweather v. Jenner, 216 U. S. 524, 30 Sup. Ct. 382, 54 L. Ed. 602, 17 Ann. Cas. 1167. See also Black on Tax Titles, § 282; Blackwell on Tax Titles, sections 566 to 578. One cotenant has no reason

to complain if his co-owner purchases the interest of a third cotenant, and the plaintiff's interest here having been separately assessed and sold, and the county having become the owner thereof, it was competent for the defendant to buy in such interest for itself. Reinboth v. Zerbe Run Improvement Co., 29 Pa. St. 139; Kirkpatrick v. Mathiot, 4 Watts & S. (Pa.) 251; Keele v. Cunningham, 2 Heisk. (49 Tenn.) 288; Watkins v. Eaton, 30 Me. 529, 50 Am. Dec. 637; Lewis v. Robinson, 9 N. M. 170, 10 Watts (Pa.) 354. See also Bissell v. Foss, 114 U. S. 252, 5 Sup. Ct. 851, 29 L. Ed. 126, where it is said:

> "It is true that one of two or more tenants in common holding by common title, cannot purchase an outstanding title or incumbrance upon the joint estate for his own benefit. Such a purchase inures to the benefit of all, because there is an obligation between them, resulting from their joint claim and community of interest, that one of them shall not affect the claim to the prejudice of the other. * * * But this rule cannot apply to Hunter and Foss. They purchased no outstanding title or incumbrance to the prejudice of the other tenant in common. They did what any tenant in common with entire good faith might do, namely, purchased the interest of some of their cotenants without consulting the others."

[2] Moreover, notwithstanding the rule invoked by the plaintiff, the title passes to the purchaser, here the defendant, subject only to the right of the delinquent cotenant, here the plaintiff, to redeem within a reasonable time. Wilson v. Linder, 21 Idaho, 576, 123 Pac. 487, 42 L. R. A. (N. S.) 242, Ann. Cas. 1913E, 148; Starkweather v. Jenner, 216 U. S. 524, 30 Sup. Ct. 382, 54 L. Ed. 602, 17 Ann. Cas. 1167. As to what is a reasonable length of time depends upon the circumstances of the case, but generally speaking it may be said that, where mining property is involved, greater diligence is required than in other cases. The real value of such property is generally unknown, and is subject to great and sudden fluctuations. See Olympian Mining & Milling Co. v. Kerns, 24 Idaho, 506, 135 Pac. 255, together with cases and texts therein cited. This suit was not commenced until February, 1914, and there is no averment of an effort or an offer on the part of the plaintiff to redeem. In the amended complaint there is only a general offer "to do equity" and to "abide any such just or proper charges against his interest or the profits of the said ore as to the court may seem meet and proper." There is no specific or unqualified offer to reimburse the defendant for what it has paid out to acquire the title. Suppose that in an accounting it should turn out that this one-eighth interest is entitled to no credit from the operation of the mine; the plaintiff has not bound himself or offered absolutely to take over the title to the one-eighth interest, regardless of its value, and to fully reimburse the defendant for what it has paid on account thereof. For approximately five years prior to the commencement of the suit he knew of the condition of the title, and of the claim that he had been divested thereof by reason of the tax proceedings. We need not consider what would be a high degree of diligence, for no diligence at all has been shown. Sunny Brook Zinc & Lead Co. v. Metzler (D. C.) 231 Fed. 304.

[3] Coming now to the alleged defects in the tax title, the point that the sale was void because the property was sold to the county on the

first day of the sale is fully answered in Bacon v. Rice, 14 Idaho, 114, 93 Pac. 511. This court will, of course, follow the Supreme Court of the state in the construction of a state statute.

[4] The next contention is that, under the system prevailing in Idaho, an undivided interest cannot be separately assessed for taxation purposes, but that the valuation must be placed upon the property ,as a whole. Section 1752 of the Revised Codes of Idaho provides that:

"If the owner or possessor [of the property] does not, then the collector may, designate it, and the person who will take the least quantity of the land, or in case an undivided interest is assessed, then the smallest portion of the interest, and pay the taxes, penalties and costs due, including fifty cents to the collector for the duplicate certificate of sale, is the purchaser."

Manifestly there is here an express recognition of the right to assess an undivided interest. If we consider the objection as limited to mining property, which is valued in a peculiar way for assessment purposes, we find that in case of the failure of the owner of the mine to pay his taxes, under section 1872 of the Revised Codes, the collector is authorized and required to enforce the payment by following the course prescribed for the enforcement of taxes against other property, including the directions contained in section 1752 already quoted. It would seem to be clear, therefore, that the assessor is authorized to value for assessment purposes separately the several interests of part owners of a mining property and their several interests in the proceeds of the operation thereof. Tong v. Maher, 45 Mont. 142, 122 Pac. 279.

[5] The next, and perhaps the most serious, contention is that the method of taxing mining property as followed in this case, and as prescribed in sections 1863 to 1872, inclusive of the Revised Codes of Idaho, is in violation of the Constitution, in that it is inconsistent with sections 2, 3, 5, and 8 of article 7 thereof. These sections are as follows:

"Sec. 2. The Legislature shall provide such revenue as may be needful, by levying a tax by valuation, so that every person or corporation shall pay a tax in proportion to the value of his, her, or its property, except as in this article herein otherwise provided. The Legislature may also impose a license tax (both upon natural persons and upon corporations, other than municipal, doing business in this State); also a per capita tax: Provided, the Legislature may exempt a limited amount of improvements upon land from taxation.

"Sec. 3. The word 'property' as herein used shall be defined and classified by law."

"Sec. 5. All taxes shall be uniform upon the same class of subjects within the territorial limits, of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal: Provided, that the Legislature may allow such exemptions from time to time as shall seem necessary and just, and all existing exemptions provided by the laws of the territory, shall continue until changed by the Legislature of the state: Provided, further, that duplicate taxation of property for the same purpose during the same year, is hereby prohibited."

"Sec. 8. The power to tax corporations or corporate property, both real and personal, shall never be relinquished or suspended, and all corporations in this state or doing business therein, shall be subject to taxation for state, county, school, municipal, and other purposes, on real or personal property

owned or used by them, and not by this constitution exempted from taxation within the territorial limits of the authority levying the tax."

It is not questioned that the assessor pursued the course pointed out by the statutes; that is, he valued the surface of the claims at the government price for mineral lands, and all other property and surface improvements, including machinery and structures of all kinds, at their cash value, and added thereto the net annual proceeds of operation for the preceding year. Instead of directly assessing the ore bodies, which usually constitute the chief actual value of the property, the statute contemplates the assessment only of the net output, and this is its most distinctive feature. It may very well be that the system is highly discriminative in favor of mining property. With that question, however, we are only incidentally concerned. Responsibility for the system rests with the Legislature, not with the courts. There is here no question of the legislative intent. Our consideration, therefore, extends only to the question of legislative power. What are its constitutional limitations? The validity of the tax here, in so far as it relates to machinery and buildings, is, of course, not subject to the objection under discussion. That being true, it may very well be doubted whether the plaintiff is in a position to assail the tax title, even were it conceded that in other respects the tax was invalid. It may further be doubted whether he can be heard to complain of the valuation which, assuming his views of the law to be correct, is manifestly too low; he has no real grievance. But, putting aside these questions, is the net income method of mine assessment obnoxious to the constitutional provisions above quoted? The meaning of these provisions is not entirely clear, and, were we to consider the phraseology alone, I should be very much inclined to sustain the plaintiff's view. That would be the more natural import of the language, and the inherent reasons for excepting mining property from the general ad valorem system of assessment do not greatly impress me. But, when we give consideration to the circumstances surrounding the drafting and adoption of the Constitution, I am constrained to a different conclusion. There can be no question that at that time there was a prevalent sentiment in favor of stimulating and fostering the development of mineral lands by relieving such property from the burden of taxation. The territorial statutes wholly exempted "mining claims," and while more recently it has been held by a majority of the Supreme Court of the state (in Salisbury v. Lane, 7 Idaho, 370, 63 Pac. 383) that the exemption did not extend to patented "mining claims," still it is thought that prior to the rendition of this decision the view maintained in the able dissenting opinion was generally accepted. But, be that as it may, even though limited in its application to unpatented claims, the statute would in that early day operate to exempt most mining property, for there was no great advantage, especially in the case of an operating mine, in having a patent. The sentiment in favor of the generous treatment of mining property is clearly reflected in the debates in the constitutional convention upon the subject of taxation, and I have little doubt that, while the disposition of the convention was in favor of the method here assailed,

it was not expressly provided for in the Constitution, out of deference to the desire of many to leave the whole matter to the discretion of the Legislature. And article 7 was finally adopted, I think, with the understanding that the matter was so left to the discretion of the Legislature. The clause "uniform upon the same class of subjects" seems to have been borrowed from the Colorado Constitution, and in April, 1889, a few months before the convention, the Supreme Court of Colorado, in People ex rel. Iron, etc., M. Co. v. Henderson, 12 Colo. 369, 21 Pac. 144, held valid revenue statutes very similar to those presently involved. The decision was published in April, 1889, and it is not unreasonable to assume that it attracted general attention in Idaho, where like conditions were to be found, and especially where preparation was being made for statehood. It must have been known to the convention, having, as it did, among its members many who were eminent at the bar, and surely, if it was intended to prohibit the Idaho Legislature from doing the very thing which the Colorado Legislature had done, and which the Supreme Court of that state had held to be not violative of the Constitution, the language of that Constitution would not have been borrowed without some express provision denying to the Legislature the power to do the objectionable thing. Admittedly, as was said in Salisbury v. Lane, supra, it was intended to confer on the Legislature the power to exempt mining property entirely from taxation, and, as we have seen, the people were living under a system where it was in fact largely, if not entirely, exempt. We cannot, therefore, by now assuming the unreasonableness or the inequality of the income method, draw an inference against the intention of either the convention or the people to leave the matter to the discretion of the Legislature. In view of conditions as they then actually existed, it is quite probable that, if the proposed Constitution had expressly imposed the system later established by the Legislature, it would have been adopted without any general opposition. See, also, Achenbach v. Kincaid, 25 Idaho, 780, 140 Pac. 529; In re Gross Production Tax of Wolverine Oil Co. (Okl.) 154 Pac. 362.

It may be, as suggested, that in some respects the conduct of the defendant following the termination of the former suit is subject to criticism; but we are here concerned with its shortcomings only in so far as they are actionable. It is not seeking equitable relief, and hence is not subject to the conditions upon which such relief is granted or withheld. Upon the other hand, what is to be said of the complainant's conduct? In the most favorable view I have been able to take of the record, he is chargeable with gross neligence. He was not ignorant of the possibility of a separate assessment upon his one-eighth interest. In 1903 he waged a suit against the county officers to enjoin the enforcement of such a tax. When his long and bitter contest with the defendant's predecessor was finally determined in his favor, he certainly had no reason to assume that it, the defeated party, would go out of its way to advance the taxes upon an interest in the property which it had lost in the litigation. It is to be borne in mind that plaintiff does not claim to have had any amicable

understanding with the defendant for the operation of the property or the "protection" of his interest until 1907. Prior to that time, who did he suppose was "protecting" his interest against the taxes for 1905 and 1906? While now enfeebled by disease, so far as the record shows he was then a vigorous man, and had recently come into possession of what generally would be regarded as a large fortune. There was no reason why he should not, and every reason why he should, himself take care of his interest and protect it against taxes, if they were unjust, and pay them, if they were just. Whatever view may now be taken of the matter, he then had no reason to believe, and he did not believe, that the defendant owed him anything. He had just had a complete accounting, with which he was apparently satisfied, and pursuant to the orders of the court he had been paid, and he had accepted, the entire amount found due. That he knew his property had been assessed can hardly be open to doubt. What did he expect? Certainly not that the defendant was going to pay the taxes. He could not assume that its feelings were friendly. It had none of his money with which to make payment. He gave no directions and made no request touching the taxes of 1905 or 1906, and not even in the conversations had with the defendant's manager in 1907 did he specifically refer to these taxes, or express any wish relative thereto. He had contested an earlier tax, and did he think that the corporation would, without any request or authorization, take of its own money and gratuitously pay a tax which he was probably unwilling to pay, and the validity of which was not free from doubt? It is to be noted that, while he is here contending that it was the defendant's duty to pay the tax, he is with equal force assailing the validity thereof. Having in mind such an attitude, what would have been the defendant's plight, had it voluntarily made payment? Would it not thus have put itself in jeopardy? Upon an accounting, or upon a demand for reimbursement, would it not have been met with the contention that it had gratuitously paid an invalid claim, and was therefore not entitled to reimbursement?

The truth probably is that the plaintiff believed the tax to be invalid, and perhaps also thinking that the property had been mined out and was of doubtful value, he was indisposed to pay the claim. This theory is corroborated by his attitude in 1909, when, knowing of the county's claim, instead of satisfying it, he only protested against the sale to a third party, and did not offer to pay any part of the tax.

Upon the whole, I am inclined to think that no ground for equitable relief has been shown, and the bill will therefore be dismissed.